UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ANTHONY W. TAYLOR,          )
                                   )
          Plaintiff,       )     No.:1:17-cv-2384-JMS-MPB
v.                            )
                                   )
CORIZON HEALTH,         )
                                 )
          Defendants,     )

**DEFENDANTS MICHAEL PERSON, M.D., CHRISTOPHER NELSON, M.D., BARBARA BRUBAKER, NP, DEBORAH PERKINS, NP, KATRINA CLARKSON AND STEVEN CLARKSON, AS PERSONAL REPRESENTATIVES OF THE ESTATE OF JOHN B. CLARKSON, M.D., AND CORIZON, LLC'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendants Corizon, LLC, Michael Person, M.D., Barbara A. Brubaker, NP, Deborah Perkins, NP, Christopher Nelson, M.D., and Katrina Clarkson and Steven Clarkson, as Personal Representatives of the Estate of John B. Clarkson, M.D. ("Defendants"), by and through counsel, submit this Brief in support of their Motion for Summary Judgment, attached hereto. Specifically, Defendants state the following:

## I.      INTRODUCTION

Anthony Taylor ("Plaintiff"), an inmate incarcerated by the Indiana Department of Correction ("IDOC"), initiated this 42 U.S.C. § 1983 action *pro se* on July 6, 2017. (*See* Doc. 1). Plaintiff claims he suffers from chronic kidney disease ("CKD"), which has worsened due to Corizon's "inadequate system for maintaining offender treatment." (Doc. 1, pp. 2-3). Plaintiff claims Defendants have denied him prescribed medications, timely evaluation of his conditions, timely administration, adequate staffing, and effective supervisory observation. (*Id*.) Plaintiff claims that, on November 12, 2015, Dr. Person provided no treatment for his kidney condition. (*Id*. at 3). He claims the denial of treatment has been continued by NP Brubaker, Dr. Clarkson, Dr. Nelson, and NP

1

Perkins. (*Id*.) Plaintiff claims that, as a result, he has right side pain, dark urine, yellow eyes, painful swollen lymph nodes, boils, and a knot "or something" on the right side of his abdomen in the area of his kidney. (*Id*. at 2-3). Plaintiff claims his CKD has progressed and has also begun to affect his liver. (*Id*. at 3). Based on these allegations, Plaintiff claims violations his Eighth Amendment rights. (*Id*. at 2-3). In relief, Plaintiff seeks monetary damages. (*Id*. at 4).

## II. STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

**A.** **Plaintiff's Medical Records and Treatment**

CKD is an incurable and irreversible condition that is characterized by a gradual loss of kidney function over time. (Declaration of Bruce Ippel, M.D., attached hereto as Exhibit A, ¶ 7). There are five stages of kidney disease. A patient's stage of kidney disease is measured by his estimated glomerular filtration rate ("eGFR"), a measure of kidney function. Creatinine levels in the blood also help measure kidney function. A patient with an eGFR between 30 and 59 has Stage 3 CKD. Normal levels of creatinine for adult males is between 0.6 to 1.2 milligrams (mg) per deciliter (dL). (*Id*.)

Treatment of CKD consists of monitoring a patient's signs and symptoms and reducing complications in order to slow progression of the disease. (*Id*. ¶ 8). A patient with CKD should follow a healthy lifestyle, including doing regular exercise, avoiding over-the-counter non-steroidal anti-inflammatory drugs ("NSAIDS"), and restricting salt intake. There is no medication specifically for CKD, but medication can help control complications and symptoms of CKD, such as high blood pressure, high cholesterol, anemia (lack of red blood cells), and edema (water retention). Monitoring of a patient's blood pressure is important because high blood pressure can damage blood vessels in the kidney, reducing their ability to work properly. (*Id*.)

Plaintiff's CKD is stable and asymptomatic. (*Id*. ¶ 9). Because Plaintiff's eGFR and creatinine levels have remained stable for several years, it is Dr. Ippel's belief that his abnormal eGFR and creatinine levels may not be a result of CKD or deterioration of his kidneys but, instead, congenital in nature. In other words, Plaintiff's baseline eGFR and creatinine values may fall outside of the range for a normal African-American male adult, but that does not necessarily signal kidney damage. Plaintiff does not require medications for a congenital kidney abnormality, but monitoring is appropriate in order to confirm that his kidney function remains stable. Plaintiff has been monitored by the medical staff through chronic care appointments, during which a provider evaluates his subjective complaints and objective symptoms, and laboratory testing, which measure any progression of kidney damage. Plaintiff's lab tests have showed that his kidney function has remained stable over several years. Plaintiff does not require medications for his condition. (*Id*.)

Dr. Clarkson saw Plaintiff only once in a chronic care clinic on November 3, 2013, and was not involved in Plaintiff's medical treatment after that date. (*Id*. ¶ 10). Dr. Nelson saw Plaintiff on only one occasion on March 16, 2014, and was not involved in Plaintiff's medical treatment after that date. (Declaration of Christopher Nelson, attached hereto as Exhibit B, ¶ 4). NP Perkins saw Plaintiff in chronic care clinics on May 30, 2014, and November 21, 2014. (Declaration of Deborah Perkins, attached hereto as Exhibit C, ¶ 3). On February 24, 2015, she rescheduled a chronic care appointment for Plaintiff. She was not involved in Plaintiff's medical treatment after February 24, 2015. (*Id*.)

In her only appointment with Plaintiff, on July 24, 2015, NP Brubaker saw Plaintiff in a chronic care clinic for his CKD. (Declaration of Barbara Brubaker, NP, attached hereto as Exhibit D, ¶ 8). Plaintiff denied abdominal pain, and his back and abdomen were nontender and

3

without abnormalities upon examination. Plaintiff also did not complain of urinary abnormalities. NP Brubaker did not observe abnormal lymph nodes, boils, yellow eyes, or a "knot" on the right side of Plaintiff's abdomen. NP Brubaker determined that Plaintiff's CKD was stable, and that he did not exhibit any complications or symptoms of CKD, such as high blood pressure, indicating that he required medications. Plaintiff's March 2, 2015 lab tests showed that his eGFR and creatinine level had improved. (*Id.*) Plaintiff's eGFR was 58 and his creatinine was 1.52. (Ippel Decl., Ex. A, ¶ 12). However, NP Brubaker was concerned about his potassium level, which was slightly elevated. (Brubaker Decl., Ex. D, ¶ 8).  NP Brubaker ordered lab tests and a chronic care appointment in three months. Plaintiff received labs on July 29, 2015, which showed that Plaintiff's potassium level was within normal limits, indicating that no further action was required. His eGFR and creatinine were also stable. (*Id.*) Plaintiff did not require a special diet for his CKD, as his eGFR results showed kidney function within a stable range. (*Id.* ¶ 9).

On November 12, 2015, Dr. Person saw Plaintiff for a chronic care appointment for his CKD. (Declaration of Dr. Michael Person, attached hereto as Exhibit E, ¶ 10). Plaintiff stated he was stable, took no medications, and had no urine changes. He specifically denied a change in urine color, dysuria (painful or difficult urination), and flank pain. Dr. Person reviewed Plaintiff's July 29, 2015 lab results, which showed that Plaintiff's eGFR and his creatinine level were stable. Plaintiff's labs showed that his CKD was stable. Plaintiff's abdomen was soft and nontender without organomegaly or masses. Dr. Person assessed Plaintiff with stable CKD which did not require medications. Dr. Person ordered a chronic care appointment in three months and lab testing. (*Id.*) Dr. Person did not observe yellow eyes, abnormal lymph nodes,

boils, or a "knot" on the right side of Plaintiff's abdomen during his examination of Plaintiff. (*Id.* ¶ 11). Plaintiff's July 29, 2015 lab tests also showed no liver abnormalities. (*Id.*)

On December 23, 2015, Plaintiff had labs which showed an eGFR of 51 and creatinine of 1.71. (Ippel Decl., Ex. A, ¶ 13).

On April 1, 2016, Dr. Rafiq Fahkry saw Plaintiff in chronic care. (*Id.* ¶ 15). Plaintiff exhibited no abdominal tenderness or edema upon examination, and he denied complaints, including abdominal pain, dribbling, dysuria, hematuria (blood in urine), polyuria (large volumes of dilute urine), slow stream, urinary frequency, urinary incontinence, and urinary retention. Dr. Fahkry reviewed Plaintiff's labs and noted his kidney values were stable. Dr. Fahkry advised Plaintiff to avoid NSAIDs and over-the-counter medications and ordered labs. (*Id.*)

On June 16, 2016, Plaintiff submitted Health Care Request Form ("HCRF") No. 283557 complaining that his back pain, which he attributed to his kidney, had worsened. (*Id.* ¶ 16). He also complained of pus-filled lumps in his left groin, occasional right front abdominal pain, and sweating at night. On June 21, 2016, a nurse saw Plaintiff for these complaints. Plaintiff reported that the symptoms started two weeks prior. Upon examination, Plaintiff's abdomen was soft and nontender. The nurse performed a urine dipstick, which was negative for white blood cells and blood. The nurse ordered a urinalysis and urine culture. (*Id.*)

On July 7, 2016, Dr. Bryan Buller saw Plaintiff in chronic care. (*Id.* ¶ 17). Dr. Buller noted that Plaintiff had had elevated creatinine for years and was on no medications for CKD. Plaintiff reported staying active with some intermittent knots in the axilla (armpit) and groin that had resolved. He also stated he had a boil on his right leg that caused swelling which had improved. Plaintiff also reported occasional back soreness but stated that he was able to be physically active. Plaintiff denied dysuria, slow stream, urinary frequency, and urinary

5

incontinence. Upon examination, Plaintiff exhibited no abnormalities. Dr. Buller assessed Plaintiff with stable and asymptomatic CKD and ordered labs and a chronic care appointment in three months. Dr. Buller ordered no changes to Plaintiff's plan of care. (*Id.*)

On July 12, 2016, Plaintiff received a urine culture, which was negative for abnormalities. (*Id.* ¶ 18). On July 14, 2016, Plaintiff received labs which showed eGFR of 51 and creatinine of 1.71. (*Id.* ¶ 19).

On September 13, 2016, a nurse saw Plaintiff for complaints of knots on the right top of his foot, left groin area, and right axilla. (*Id.* ¶ 20). Plaintiff reported that the knots appeared six days prior and sometimes burned and itched. The nurse noted whiteheads, blackheads, or non-inflamed papules, and blisters, callouses, or boils on the right top of Plaintiff's foot, left groin, and right axilla without drainage. She advised Plaintiff as to how to treat the condition with heat and provided a handout. (*Id.*)

On September 19, 2016, NP Jeffrey Glover saw Plaintiff for his blister complaints and to discuss his lab results in follow-up to his nursing appointment. (*Id.* ¶ 21). Plaintiff's eyes, lymph nodes, and abdomen were normal upon examination. Plaintiff also exhibited no edema but did exhibit minor isolated skin lesions. NP Glover assessed Plaintiff with a skin infection and prescribed Bactrim (an antibiotic). (*Id.*)

On October 25, 2016, NP Loretta Dawson saw Plaintiff in chronic care. (*Id.* ¶ 22). NP Dawson noted that Plaintiff was not taking medications for CKD. Plaintiff denied pain upon urination, abdominal pain, dribbling, dysuria, hematuria, polyuria, slow stream, urinary frequency, urinary incontinence, and urinary retention. NP Dawson noted that Plaintiff's lab values and blood pressure were stable. Plaintiff reported occasional back pain, but his gait was steady. Upon examination, Plaintiff exhibited no eye or abdominal abnormalities. NP Dawson

noted that Plaintiff was negative for edema. NP Dawson assessed Plaintiff with stable CKD and ordered labs and continuation of his present plan of care. She also provided Tylenol for Plaintiff's minor back complaints and advised Plaintiff to drink plenty of fluids and purchase muscle rub as needed. (*Id.*)

On January 5, 2017, Plaintiff received labs which showed eGFR of 53 and creatinine of 1.63. (*Id.* ¶ 23).

Until March 31, 2017, Corizon was the contracted health care provider for Indiana prisons. (*Id.* ¶ 2). Wexford Health replaced Corizon as the contracted health care provider for Indiana prisons on April 1, 2017. (*Id.*)

On May 8, 2017, Plaintiff submitted HRCF No. 352085 complaining about two lumps on his groin and a rash. (*Id.* ¶ 24). A nurse saw him on May 11, 2017, and instructed him to request further care if his symptoms persisted. (*Id.*)

On May 12, 2017, Dr. Ippel saw Plaintiff in chronic care. (*Id.* ¶ 25). Dr. Ippel noted that Plaintiff was fairly healthy and did not need any medications. Dr. Ippel also noted that Plaintiff's creatinine levels had remained stable between 1.5 and 1.8 for a decade and that the elevation could be congenital in nature. Continued monitoring was the clinically indicated treatment for his CKD. Plaintiff also reported occasional breakouts of painful bumps under his arms, groin, or elsewhere. Plaintiff reported that the bumps became smaller when he cut back on workouts, and that his knee did not bother him and never had. Upon examination, Plaintiff exhibited no abdominal abnormalities but some crepitus (cracking) in his knees. Dr. Ippel also found a two centimeter compressible nontender nodularity on the back of Plaintiff's right knee, which Dr. Ippel diagnosed as a Baker's cyst, a common condition that is caused by knee joint conditions such as arthritis and unrelated to CKD. Dr. Ippel noted he would order a knee brace and

7

prescribed Prednisone for Plaintiff's patellar syndrome and Baker's cyst. Dr. Ippel advised Plaintiff as to the importance of staying fit and trim to prevent diabetes and high blood pressure, which could exacerbate his stable mild renal failure. Dr. Ippel also assessed Plaintiff with apocrine acne and prescribed benzoyl peroxide (a topical antibacterial and anti-inflammatory medication) and Prednisone (a steroid) to treat inflammation. (*Id*.) Apocrine acne is a chronic skin condition characterized by lumps in areas such as the armpits or groin. (*Id*. ¶ 26). Apocrine acne is not related to CKD. Plaintiff's apocrine acne is not a complication of CKD or a sign of deterioration of his kidneys. (*Id*.)

On June 9, 2017, Plaintiff received labs which showed eGFR of 62 and creatinine of 1.51. (*Id*. ¶ 27). On August 24, 2017, Dr. Kenneth Robertson saw Plaintiff in chronic care. (*Id*. ¶ 28). Dr. Robertson noted that Plaintiff's eGFR was normal at 62, his BUN (blood urea nitrogen; elevated BUN levels may signal decreased kidney function) was normal at 18 on June 9, 2017, and his creatinine was chronically elevated at 1.51, which was down from 1.7 in 2015. Dr. Robertson did not order a change in Plaintiff's treatment plan. (*Id*.)

On November 2, 2017, Dr. Gerald Bowen saw Plaintiff in chronic care. (*Id*. ¶ 29). Plaintiff denied abdominal pain and back pain. Upon examination, Plaintiff exhibited some central epigastric tenderness and a 2 cm by 2 cm mass in the middle of his abdomen. Dr. Bowen noted that Plaintiff was concerned about the lower end of the sternum and had been repeating his examination of the area, making it tender. Dr. Bowen reassured him that the condition was not serious. Dr. Bowen assessed Plaintiff with CKD and prescribed benzoyl peroxide for Plaintiff's apocrine acne. Dr. Bowen did not order a change in Plaintiff's treatment plan. (*Id*.)

On November 16, 2017, a nurse saw Plaintiff for complaints of 4/10 abdominal pain that radiated to his lower back. (*Id*. ¶ 30). He stated he had had the problem for three to four years

and wanted to discuss it with a medical provider. The nurse noted that Plaintiff's abdomen was soft, nondistended, and exhibited normal bowel sounds, and that Plaintiff exhibited no signs or symptoms of distress. The nurse referred Plaintiff to a provider. Dr. Platz evaluated Plaintiff and ordered a urinalysis and labs. Plaintiff's labs were negative for abnormalities. (*Id*.)

On April 23, 2018, NP Dawson saw Plaintiff in chronic care. (*Id*. ¶ 32). Plaintiff denied dysuria and back pain. Upon examination, his eyes and abdomen were normal, and he exhibited no edema. NP Dawson noted that Plaintiff's creatine levels were mildly elevated and advised him to drink fluids. Because Plaintiff was concerned about abdominal discomfort which he stated had occurred for the past two years, NP Dawson ordered an abdominal x-ray. (*Id*.) On April 30, 2018, Plaintiff received an abdominal x-ray which showed mild fecal retention but no other abnormalities. (*Id*. ¶ 32).

On May 10, 2018, Dr. Robertson saw Plaintiff to review his x-ray. (*Id*. ¶ 33). Dr. Robertson advised Plaintiff that the x-ray showed no acute changes. Upon examination, Plaintiff's abdomen was soft, and he reported mild tenderness of the right upper quadrant ("RUQ"). Dr. Robertson noted that the edge of Plaintiff's liver was palpable. Dr. Robertson noted he would request an ultrasound to assess the status of Plaintiff's renal artery flow and gallbladder. (*Id*.) He submitted the request later that day. (*Id*. at 101-03). On May 23, 2018, Plaintiff had labs which showed eGFR of 53 and creatinine of 1.71. (*Id*. ¶ 34). That Plaintiff's liver was palpable is not indicative of liver abnormality, particularly where Plaintiff's May 23, 2018 lab results showed normal liver function. (*Id*. ¶ 35). Specifically, Plaintiff's AST and ALT levels (AST and ALT are liver enzymes which indicate liver damage or injury) were normal. (*Id*.)

On May 30, 2018, Plaintiff received a renal Doppler arterial ultrasound, which showed no evidence of significant renal artery stenosis (narrowing of the arteries that carry blood to the kidneys), hydronephrosis (swelling in one or both kidneys), or focal renal abnormality. (*Id*. ¶ 36).

On June 13, 2018, Dr. Ippel saw Plaintiff to discuss his ultrasound results and his reported RUQ pain. (*Id*. ¶ 37). Plaintiff reported intermittent RUQ pain in the distant past but intermittent shooting pain in the area in the past two years, particularly when he did crunches. He also reported early satiety but no other gastrointestinal symptoms besides some gas. Upon examination, Plaintiff's abdomen was generally normal without masses, but he reported mild abdominal tenderness to moderate finger pressure in an area three or four centimeters from the middle of his abdomen. Dr. Ippel noted that Plaintiff's labs were stable and that a renal ultrasound showed no significant abnormalities. Dr. Ippel assured Plaintiff that his clinical presentation showed no evidence of significant disease process and that his creatinine levels were likely to be a metabolic setpoint issue rather than a kidney disease. Dr. Ippel advised him that his reported abdominal pain was likely radicular due to mild nerve compression in the thoracic spine. Dr. Ippel noted that he would request a physical therapy consultation. Plaintiff did not require further measures for his mild abdominal pain. (*Id*.)

Plaintiff's records reflect no complaints of dark urine, yellow eyes, painful swollen lymph nodes, or a know on his kidney, nor has any provider observed these alleged symptoms. (*Id*. ¶ 38). Plaintiff's apocrine acne and reported right-sided pain are also unrelated to his CKD. (*Id*.)

Plaintiff has been regularly monitored by his health care providers. (*Id*. ¶ 39). His health care complaints have been addressed appropriately by his providers. Plaintiff's CKD has been stable for years. At no time has Plaintiff exhibited any complications of CKD, such as high blood

pressure, indicating that he required medications. To the extent Plaintiff complains about perceived lapses or delays in his care, such as chronic care evaluations, any such lapses did not harm him. If Plaintiff had emergent complaints, such as complaints of back pain or kidney-related complaints, he was able to access medical care by submitting a health care request form. Plaintiff did not require more treatment than he received for his kidney condition. The care provided to Plaintiff did not cause him any injury or harm. (*Id.*)

### III. ARGUMENT

**A.**     **<u>Standard for Summary Judgment</u>**

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Olson v. Morgan*, 750 F.3d 708, 713 (7th Cir. 2014). The movant has the initial burden of showing that no genuine issue of material facts exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant must inform the district court of the basis for its motion, and identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Id.* The movant can also discharge its initial burden by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. *Id.* at 325.

If the movant meets this burden, the party opposing summary judgment must offer evidence of specific facts sufficient to raise a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The nonmoving party must go beyond the pleadings and by his own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324. After evidence is submitted in a summary judgment

proceeding, the non-movant cannot rest on his pleadings but must produce his own evidence. *Hughes v. Joliet Corr. Ctr.*, 931 F.2d 425, 428 (7th Cir. 1991).

Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249-50. Moreover, "a factual dispute is 'genuine' only if a reasonable jury could find for either party." *Olson*, 750 F.3d at 713 (quotation omitted).

## B.  Deliberate Indifference Under 42 U.S.C. § 1983

42 U.S.C. § 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). As such, it is a mechanism for bringing claims for federal constitutional or statutory violations.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment. U.S. Const. amend. VIII. However, not every claim by a prisoner that he has not received adequate medical treatment constitutes a constitutional violation. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). A prison official may be found liable only if he "knows of and disregards an excessive

risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). To state a cause of action under the Eighth Amendment, a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent. *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008) (citation omitted). A successful § 1983 plaintiff must also establish not only that a state actor violated his constitutional rights, but that the violation caused the plaintiff injury or damages. *Roe v. Elyea*, 631 F.3d 843, 846 (7th Cir. 2011) (citation omitted).

"An objectively serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (internal quotation omitted). The subjective inquiry turns on what risk the medical staff knew of and "whether the course of treatment was so far afield as to allow a jury to infer deliberate indifference." *Duckworth*, 532 F.3d at 680.

"Under the Eighth Amendment, [a plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

> A prisoner may establish deliberate indifference by demonstrating that the treatment he received was "blatantly inappropriate." *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005) (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)). Making that showing is not easy: "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998)). Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment

> unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011); *Sain*, 512 F.3d at 895.

*Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (footnote omitted).

The Supreme Court has also explained that the inadvertent failure to provide adequate medical care does not violate the Eighth Amendment. *See Estelle*, 429 U.S. at 105-06. An allegation that a doctor "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* at 106; *see also Greeno*, 414 F.3d at 653 ("[N]either medical malpractice nor a mere disagreement with a doctor's medical judgment amounts to deliberate indifference.").

## C.  Municipal Liability Under § 1983

Corizon is "treated the same as a municipality for liability purposes under § 1983." *See Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010) (holding that a corporation that contracted with a jail to provide health services is "treated the same as municipalities for liability purposes in a § 1983 action"); *Fromer v. Corizon, Inc.*, 54 F. Supp. 3d 1012, 1027 (S.D. Ind. 2014). "It is well-established that there is no *respondeat superior* liability under § 1983." *Fromer*, 54 F. Supp. 3d at 1028 (quoting *Jackson v. Ill. Medi–Car, Inc.*, 300 F.3d 760, 766 (7th Cir. 2002)). "A 'private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights." *Id.*

Because § 1983 does not permit liability to rest on the doctrine of *respondeat superior*, Plaintiff is required to show that a Corizon policy was the "direct cause" of or "moving force" behind his constitutional injury. *Pyles*, 771 F.3d at 409-10. To do so, he must introduce evidence that establishes a plausible inference that Corizon "maintain[ed] a policy that sanction[ed] the

maintenance of prison conditions that infring[ed] upon the constitutional rights of the prisoners." *Woodward v. Corr. Med. Servs.*, 368 F.3d 917, 927 (7th Cir. 2004). "If a plaintiff cannot identify any formal policy that is unconstitutional, the plaintiff may show deliberate indifference through a 'series of bad acts' creating an inference that municipal officials were aware of and condoned the misconduct of their employees." *Fromer*, 54 F. Supp. 3d at 1028. Moreover, Plaintiff cannot rely on the circumstances surrounding his own medical treatment to establish the existence of a policy or practice. *See Palmer*, 327 F.3d at 597 (holding that "a showing of isolated incidents does not create a genuine issue as to whether defendants have a general policy or a widespread practice of an unconstitutional nature").

**D.     Plaintiff's Claims Against NP Perkins, Dr. Clarkson, and Dr. Nelson Are Barred by the Statute of Limitations.**

42 U.S.C. § 1983 incorporates the forum state's statute of limitations period for personal injury claims. *Malone v. Corr. Corp. of Am.*, 553 F.3d 540, 542 (7th Cir. 2009). The statute of limitations for personal injury cases arising in Indiana is two years. Ind. Code § 34-11-2-4; *Snodderly v. R.U.F.F. Drug Enforcement Task Force*, 239 F.3d 892, 894 (7th Cir. 2001) (two-year statute of limitations "is applicable to all causes of action brought in Indiana under 42 U.S.C. § 1983"). Federal law determines the accrual of a claim, which generally occurs "when the plaintiff knows or has reason to know of the injury giving rise to the cause of action." *Wilson v. Giesen*, 956 F.2d 738, 740 (7th Cir. 1992).

Plaintiff's claims against Dr. Clarkson, Dr. Nelson, and NP Perkins are barred by the statute of limitations. Plaintiff last saw Dr. Clarkson on November 3, 2013, and Dr. Nelson on March 6, 2014. (Ippel Decl., Ex. A, ¶ 10; Nelson Decl., Ex. B, ¶ 4). NP Perkins's involvement in Plaintiff's medical treatment ceased on February 24, 2015. (Perkins Decl., Ex. C, ¶ 3). Plaintiff initiated this action on July 6, 2017, (Doc. 1), over two and a half years after NP Brubaker was

last involved in Plaintiff's medical care, over three years after his last appointment with Dr. Nelson, and nearly four years after his last appointment with Dr. Clarkson. Accordingly, Plaintiff's allegations against NP Perkins, Dr. Clarkson, and Dr. Nelson are beyond the two-year statute of limitations. Plaintiff's claims against these Defendants are barred by the statute of limitations and must be dismissed. *Snodderly*, 239 F.3d at 894.

**E.**     **NP Brubaker, Dr. Person, and Corizon Did Not Violate Plaintiff's Eighth Amendment Rights.**

Defendants acknowledge that Plaintiff's kidney condition constituted an objectively serious medical need. *See King*, 680 F.3d at 1018. Defendants are entitled to summary judgment, however, because they were not deliberately indifferent to that injury.

   i.     *NP Brubaker and Dr. Person appropriately addressed Plaintiff's CKD.*

Summary judgment should be granted to NP Brubaker and Dr. Person because they did not knowingly disregard any risk of harm to Plaintiff. NP Brubaker saw Plaintiff only one time on July 24, 2015. (Brubaker Decl., Ex. D, ¶ 8). At this appointment, Plaintiff did not exhibit any complications from CKD, nor did NP Brubaker observe physical abnormalities related to CKD. Because NP Brubaker was concerned about Plaintiff's elevated potassium, she ordered repeat testing and a chronic care follow-up appointment. NP Brubaker believed that no medications were required for Plaintiff. Plaintiff's July 29, 2015 labs showed normal potassium levels and stable eGFR and creatinine levels, confirming that no further treatment was required. (*Id.*) Similarly, at Dr. Person's only appointment with Plaintiff on November 12, 2015, Plaintiff's CKD was stable and did not require medications. (Person Decl., Ex. E, ¶ 10). Plaintiff specifically denied a change in urine color and flank pain, and he exhibited no abnormalities upon examination. (*Id.*) NP Brubaker and Dr. Person's decisions that Plaintiff did not require medications or other treatment for his stable and asymptomatic CKD were based on their

medical judgment. (Brubaker Decl., Ex. D, ¶ 8; Person Decl., Ex. E, ¶ 10). As Dr. Person explained, while medications may be necessary to control complications or symptoms of CKD, such as high blood pressure, high cholesterol, anemia, or edema, Plaintiff did not exhibit such complications or abnormalities in his diagnostic testing or upon examination. (Brubaker Decl., Ex. D, ¶ 8; Person Decl., Ex. E, ¶ 10). Moreover, no medical provider who has evaluated Plaintiff after NP Brubaker and Dr. Person has ordered a change to their course of treatment. The record is thus devoid of evidence demonstrating that Dr. Person and NP Brubaker's decisions rise to the level of "criminal recklessness." *O'Mally v. Litscher*, 465 F.3d 799, 806 (7th Cir. 2006) (internal quotation omitted).

Contrary to Plaintiff's allegations, Plaintiff did not complain of right-sided pain or dark urine to NP Brubaker or Dr. Person. (Brubaker Decl., Ex. D, ¶ 8; Person Decl., Ex. E, ¶ 11). He also did not exhibit yellow eyes, painful swollen lymph nodes, boils, and a knot on the right side of his abdomen upon examination. (*Id.*) Indeed, Plaintiff specifically denied flank pain and urinary abnormalities to Dr. Person. (Person Decl., Ex. E, ¶ 10). Plaintiff also denied abdominal pain to NP Brubaker and exhibited no abdominal abnormalities upon examination. (Brubaker Decl., Ex. D, ¶ 8). Additionally, Plaintiff's objective lab results have been negative for liver damage or injury. (*See* Ippel Decl., Ex. A, ¶ 35; Person Decl., Ex. E, ¶ 11). In summary, Plaintiff's allegations regarding his alleged CKD symptoms are not supported by the objective medical evidence. As set forth above, the evidence instead demonstrates that Dr. Person and NP Brubaker did not ignore a "substantial risk of serious harm" to Plaintiff. *Farmer*, 511 U.S. at 837.

Plaintiff's Eighth Amendment claim further fails because the medical evidence shows that he has not been harmed or injured by the treatment rendered to him by NP Brubaker, Dr. Person, or any other provider. In order to succeed on his Eighth Amendment claim, Plaintiff

must establish a constitutional violation and show that the violation caused him injury or damages. *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007). Here, Plaintiff's medical records demonstrate that he has not been injured or damaged as a result of his medical care. (Ippel Decl., Ex. A, ¶ 39). Objective diagnostic testing shows that Plaintiff's medical condition has remained stable throughout the course of his treatment. (*Id*. ¶ 9). Plaintiff's records also demonstrate that he has exhibited no complications of CKD and that he does not require medications for symptoms or complications related to CKD. (*Id*.) Further, Plaintiff's objective diagnostic testing results ruled out kidney damage and injury. Specifically, his eGFR and creatinine levels have remained stable for several years. (*See generally id*.) An abdominal x-ray and a renal Doppler arterial ultrasound also showed no kidney abnormalities. (*Id*. ¶¶ 32, 36). Based on these objective indicators, Dr. Ippel believes that Plaintiff's eGFR and creatinine levels may be attributable to congenital baseline abnormalities, not kidney damage or deterioration. (*Id*. ¶ 9). As Dr. Ippel explained, a congenital baseline abnormality is appropriately addressed with monitoring, which Plaintiff received. (*Id*.) The record evidence shows that NP Brubaker and Dr. Person's decisions led to *no* harm to Plaintiff's health. Fortunately, Plaintiff simply does not require medications for his CKD, and continued monitoring of the condition is all that is clinically indicated.

Plaintiff's medical records show that Dr. Person and NP Brubaker appropriately monitored Plaintiff's medical condition by reviewing Plaintiff's objective diagnostic testing, conducting physical examinations, and ordering follow-up care, including repeat diagnostic testing and chronic care clinics. (*See generally* Brubaker Decl., Ex. D; Person Decl., Ex. E). Plaintiff's complaints ultimately amount to a disagreement with NP Brubaker and Dr. Person's medical judgment and thus fall short of establishing an Eighth Amendment violation. *See*

*Johnson*, 433 F.3d. at 1013. Because Plaintiff has not established a violation of the Eighth Amendment, summary judgment should be granted in Defendants' favor.

> iii. *Corizon did not maintain a custom, practice, or policy that violated Plaintiff's Eighth Amendment rights.*

Summary judgment should be granted in Corizon's favor because Plaintiff has not shown that there was any constitutional violation, let alone that any Corizon policy was the "direct cause" of or "moving force" behind any such injury. *See Pyles*, 771 F.3d at 409-10. Plaintiff has presented no evidence of any widespread custom or policy of Corizon which led to "an inadequate system for maintaining offender treatment." (Doc. 1, pp. 2-3). Plaintiff cannot rely only on the circumstances surrounding his *own* medical treatment to establish the existence of a policy or practice, because isolated incidents regarding his own treatment do not create a genuine issue as to whether Corizon has a general policy or a widespread practice of an unconstitutional nature. *See Palmer*, 327 F.3d at 597.

The record shows instead that Plaintiff's medical condition was appropriately monitored by his Corizon medical providers. (*See generally* Ippel Decl., Ex. A). Plaintiff was evaluated in chronic care and sick call appointments and received lab testing to ensure that his CKD remained stable and asymptomatic. Between July 6, 2015, two years before Plaintiff initiated his Complaint, and March 31, 2017, the last day that Corizon was the contracted health care provider for Indiana prisons, Plaintiff was seen by the medical staff eight times and underwent extensive lab testing which showed no change to his CKD or deterioration of kidney function. (*Id*. ¶¶ 11-23). Even if a chronic care appointment or lab testing was delayed, he nevertheless had access to medical care for any new or emergent concerns. For example, on September 13, 2016, a nurse saw Plaintiff after he submitted a complaint relating to his apocrine acne. (*Id*. ¶ 20). A nurse practitioner subsequently evaluated Plaintiff on September 19, 2016, and prescribed an antibiotic. (*Id*. ¶¶ 20-

21). Plaintiff's complaints of mild occasional back pain, which is unrelated to CKD and which did not affect his activities of daily living (including exercise), were similarly addressed by the medical staff at multiple appointments. (*Id*. ¶¶ 16, 17, 22). The medical treatment Plaintiff received was therefore appropriate for his needs. (*Id*. ¶ 39).

Plaintiff's municipal claim against Corizon further fails because he was not harmed or injured as a result of his medical care. *Harris*, 486 F.3d at 1014. As noted above, Plaintiff's objective diagnostic tests, including lab results, an x-ray, and an ultrasound, show no deterioration in Plaintiff's kidney function or progression of CKD. (Ippel Decl., Ex. A, ¶ 39). Plaintiff's medical record is also devoid of complications of CKD. (*See generally id*.). Thus, summary judgment should be granted to Corizon.

## IV. CONCLUSION

Based on the foregoing, Corizon, LLC, Michael Person, M.D., Barbara A. Brubaker, NP, Deborah Perkins, NP, Christopher Nelson, M.D., and Katrina Clarkson and Steven Clarkson, as Personal Representatives of the Estate of John B. Clarkson, M.D., respectfully request that this Court grant their motion for summary judgment and dismiss Plaintiff's claims against them.

Respectfully submitted this 20th day of July, 2018.

Respectfully submitted,

/s/Jeb A. Crandall
JEB A. CRANDALL (#26323-49)
*Attorney for Defendants Corizon, LLC,*
*Michael Person, M.D., Barbara A.*
*Brubaker, NP, Deborah Perkins, NP,*
*Christopher Nelson, M.D., and Katrina*
*Clarkson and Steven Clarkson, as Personal*
*Representatives of the Estate of John B.*
*Clarkson, M.D.*

Jeb A. Crandall, #26323-49
Bleeke Dillon Crandall, P.C.
8470 Allison Pointe Boulevard, Suite 420
Indianapolis, Indiana  46250-4365
Phone:  (317) 567-2222
Fax:  (317) 567-2220
E-Mail:  jeb@bleekedilloncrandall.com


## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of July 2018, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

[n/a]

I hereby certify that on the 20th day of July 2018, a copy of the foregoing was mailed, by first class mail U.S. Mail, postage prepaid and properly addressed to the following:

Anthony W. Taylor #910720
New Castle Correctional Facility
New Castle – CF
Inmate Mail / Parcelse
1000 Van Nuys Road
New Castle, IN 47362
*Pro Se*

/s/ Jeb A. Crandall

646406v.1